Whitaker, Judge,
delivered the opinion of the court:
Plaintiff is a Pennsylvania stock casualty company engaged in the business of insuring against damage to automobiles. It is wholly owned by the First Pennsylvania Banking & Trust Company. This bank finances the purchase of automobiles; plaintiff’s principal business is insuring the automobiles financed by the bank.
Plaintiff reinsured the business it wrote with the Insurance Company of North America, under which North America assumed liability for 90 percent of the losses under the policies and agreed to pay 90 percent of the expenses of adjusting the losses in return for a cession to it of 90 percent of the gross premiums. In addition, North America agreed to pay plaintiff a commission of 30 percent of the net premiums ceded to it, out of which plaintiff was required to pay all brokerages, commissions, taxes and expenses in connection with writing the insurance.
For the years 1950 to 1953 the plaintiff reported the full 30 percent commissions received during the year on premiums ceded to North America as income. But in 1954 the insurance commissioner of Pennsylvania required the taxpayer thereafter to pro rate the premiums over the taxable years during which the policy was in force, in proportion to the time the policy was in force in each taxable year. The taxpayer claims it is required to report as income only the net amount of the commissions received, less a reserve for unearned commissions. The insurance commissioner required that this reserve be added to the reserve for unearned premiums. The taxpayer claims the right to deduct them under the provisions of subsection (b) (5) of section 204 of 26U.S.C. (1952 ed.) as unearned premiums.
Section 204(b) (1) defines “gross income” as the combined gross amount of investment income and underwriting income, *645 gain from the sale or other disposition of property, and all other items constituting gross income under section 22. Subsection (b) (4) defines “underwriting income” as “premiums earned on insurance contracts during the taxable year less losses incurred and expenses incurred.” Then subsection (b) (5) defines “premiums earned on insurance contracts during the taxable year” as follows:
From the amount of gross premiums written on insurance contracts during the taxable year, deduct return premiums and premiums paid for reinsurance. To the result so obtained add unearned premiums on outstanding business at the end of the preceding taxable year and deduct unearned premiums on outstanding business at the end of the taxable year.
There can be no doubt that commissions received from the Insurance Company of North America by the taxpayer clearly come within the definition of gross income laid down in section 22, and the taxpayer so treated them in its return for 1950,1951,1952 and 1958.
It is common knowledge that any insurance company pays its agents commissions for writing insurance. Plaintiff had written the insurance which it re-insured with North America. It did not write it as the agent of North America, but when it reinsured the business with North America, it was recognized that it was entitled to the usual agent’s commission. Every agent of North America who wrote insurance for it received a commission for doing so. When plaintiff reinsured the business with North America it took on, as between it and North America, the character of agent, and as such it was entitled to a commission on the amount reinsured with North America. The contract between the plaintiff and North America recognized this when it provided that plaintiff should receive a commission of 80 percent on the business reinsured with North America.
Since the income was commissions on business written for another, and not premiums the insurer was entitled to, it is clear that the taxpayer is not entitled to deduct a reserve set up in anticipation of the possibility that some part of the commissions will have to be refunded. Every insurance company sets up a reserve for unearned premiums, but this *646 is not done in anticipation of the possibility that some part of the premiums will have to be returned, but to take care of anticipated losses on the policies. This was decided as early as McCoach v. Insurance Co. of North America, 244 U.S. 585; and Maryland Casualty Co. v. United States, 251 U.S. 342. This question was carefully considered by this court in an opinion by Judge Littleton in Continental Assur. Co. v. United States, 79 C. Cls. 756, in which there was reviewed many of the opinions of the Supreme Court and of other courts bearing on this subj ect. All these decisions affirm and reaffirm that only an unearned premium reserve is deductible, and that it is a reserve set up to take care of anticipated losses on policies, and that reserves to take care of the other contingencies, although they are proper to insure solvency, are not deductible for tax purposes.
The wording of the statutes considered in those cases differs from the wording of the statute now under consideration, but they are, in essence and as construed by the Supreme Court, the same. The former statute permitted the deduction of reserves required by law. The Supreme Court and other courts held that this was limited to the unearned premium reserves set up to take care of anticipated losses on policies, and that other reserves to provide for other contingencies, although properly set up to insure solvency, did not come within its terms. This was so even though they were reserves which the insurance commissioner required the company to set up. It was so held in McCoach v. Insurance Co., supra, and in United States v. Boston Ins. Co., 269 U.S. 197, and by us in Continental Assur. Co., v. United States, sufra. The statute now under consideration expressly limits deductible reserves to those for unearned premiums. What was subject to controversy before has now been made plain.
This unearned commission reserve cannot be considered as an unearned premium reserve. It was set up for the sole purpose of taking care of the possibility that some part of the commission might have to be returned. The unearned premium reserve is to take care of anticipated losses on the policies. It is the company that carries the insurance and that has to pay these losses that sets up such a reserve, not the agent who secured the business. It was North America, *647 the reinsurer, that had to bear the loss on the policies. Under the contract plaintiff ceded to North America 90 percent of the premiums, and North America agreed to bear 90 percent of the losses on them. Plaintiff was entitled to set up an unearned premium reserve on only the 10 percent retained by it. It was liable for 10 percent of the losses and to this extent only it could set up and deduct an unearned premium reserve. It was not entitled to set up a reserve for the 90 percent ceded, for the losses on which it was no longer liable as between it and the reinsurer. The commissions were paid on only this 90 percent. It is no more entitled to deduct a reserve for the possibility that it might have to return a part of the commission than is the familiar individual insurance agent, who solicits and secures the business.
The cases cited above hold explicitly that reserves to take care of contingencies, other than anticipated losses on policies, are not deductible.
Plaintiff is not entitled to deduct the reserve for unearned commissions in 1954, the first year the insurance commissioner required the reserve to be set up, nor in the years 1950 to 1953. In the latter years it correctly reported the commissions as income in the year received, and it should have done so in the year 1954, without any deduction.
Plaintiff’s petition will be dismissed.
It is so ordered.
Littleton, Judge (Ret.); Laramore, Judge, and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the stipulation of facts, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff, Colonial Surety Company, is a stock casualty insurance company, incorporated under the laws of Pennsylvania. Its principal place of business is 1510 Chestnut Street, Philadelphia, Pennsylvania. All of its outstanding stock (except Directors’ qualifying shares) is owned by The First Pennsylvania Banking and Trust Company.
*648 2. Suit is brought for the recovery of federal income and excess profits taxes for plaintiff’s taxable years ended November 30, 1950, November 30, 1951, November 30, 1952, November 30, 1953, and November 30, 1954. No suit or process is pending in any other Court with respect thereto.
3. Plaintiff’s operations are subject to the supervisory and regulatory powers which are conferred upon the Insurance Department of the Commonwealth of Pennsylvania by the Act of May 17,1921, P.L. 789, 40 Pa. Stat. Ann. (Purdon), Section 1, et seq., as amended.
4. Prior to 1950, plaintiff was engaged solely in the business of acting as surety on construction contracts. In that year, it also began to issue policies insuring against physical damage to automobiles, and since that time it has continued to engage in this form of insurance underwriting. Almost all of the plaintiff’s insurance is written in cases where The First Pennsylvania Banking and Trust Company finances or refinances the retail purchase of automobiles. Certificates of insurance are issued by plaintiff to the individual owners of the insured automobiles.
Most of the policies are written for terms of over one year. The average ranges between approximately seventeen months and twenty-three months. The premium for the full term is paid upon issue, but upon cancellation of the policy prior to the expiration date, either by the plaintiff or by the policyholder, the portion of the premium applicable to the unexpired period is “credited to the account of” the policyholder (the so-called “return premium”).
5. Plaintiff reinsured the policies under a Eeinsurance Agreement with the Insurance Company of North America (hereinafter referred to as “North America”).
Under the Agreement, plaintiff accounts monthly to North America. North America assumes 90% of the losses sustained under the policies, and 90% of all loss adjusting expense.
North America is credited with 90% of the gross premiums and 90% of the salvage from wrecks. Plaintiff retains a “provisional commission allowance” of 30% on the net premiums received by North America, which is subject to increase, upon annual adjustment, if the loss ratio on the *649 policies has been less than 65%. Thirty percent is the minimum “commission” allowance under the Agreement. The loss ratios computed under the Agreement for the annual periods ending March 31, were 1951-73.5%; 1952-67.4%; 1953-71.7%; 1954-61.0%; 1955-57.7%
Thus, plaintiff received 37 percent of the gross premiums received from policyholders, which includes commissions, and North America received 63 percent, determined as follows: 90 percent of the premiums were ceded to North America, less a “commission” of 30 percent of the amount ceded. Where a policy was cancelled prior to the expiration of its term, the return premium was charged to the two companies in the ratio of their respective shares in the premiums, i.e., plaintiff — 37 percent, and North America — 63 percent. Plaintiff accounts monthly to North America.
6. An illustration of a computation of plaintiff’s monthly settlement with North America, based on August 1952 actual amounts, is as follows:
Total premiums received by Colonial upon issuance of auto damage policies_$286, 435.51
Less premiums returned to policyholders on cancellation of policies_ 54, 735. 91
$231, 699.60
Gross premiums ceded to North America-90 pet. of $286,435.51_ 257,791.96
Less 90 pet. of returned premiums of $54,735.91 _ 49,262.32
Net premiums ceded to North America (90 pet. of $231,699.60)_ $208, 529. 64
Less:
Commissions payable to Colonial by North America — 30 pet. of $208,529.64_ $62,558. 89
Losses chargeable to North America — 90 pet. of $109,712.59_ 98,741. 33
Loss adjustment expense chargeable to North America — 90 pet. of $4,389.81— 3,950. 83
- $165,251.05
$43,278.59
Add salvage from wrecks, etc., creditable to North America — 90 pet. of $13,254.68_ 11,938.21
$55,216.80
Net amount payable to North America by Colonial.
*650 7. The plaintiff is required to file with the Insurance Department of the Commonwealth of Pennsylvania an annual statement in the form prescribed by the National Convention of Insurance Commissioners.
In its annual statement filed with the Insurance Department of the Commonwealth of Pennsylvania for 1950 to 1953, inclusive, and in its federal income and excess profits tax returns filed for the fiscal years ended November 30, 1950, November 30, 1951 and November 30, 1952, plaintiff differentiated between that portion of its share of the premiums designated as the non-ceded ten percent and the additional 27 percent designated as a “commission”. The 10 percent was reported as income to the extent currently earned, and a reserve established for the unearned portion. The full amount of the “commission,” however, was reported as current income, and no reserve was established for the “unearned portion.”
In its annual statement for 1950, plaintiff stated the full amount of the “commission” as income as Item 11 (“Commission or insurance ceded”).
In its annual statement for 1950 to 1953, inclusive, plaintiff stated the full amount of the “commission” in an account entitled “Commission and Brokerage: Reinsurance ceded” under the heading “Other Underwriting Expenses” in the Underwriting and Investment Exhibit at page 10 of the statements. Since this income item was thus incorporated in the expense category, the “commission” was treated as an offset against the expenses and subtracted from the other current underwriting expense items, such as commissions plaintiff paid its own agents. The “commissions” generally exceeded those underwriting expenses and the excess, therefore, became part of the plaintiff’s “net underwriting gain or loss” each year at page 4, item 7 of the annual statement.
8. During the year 1954, plaintiff was notified by the Insurance Department of the Commonwealth of Pennsylvania that the “commissions” also should be reported as income “only as earned,” and it was ordered to establish a reserve for the “unearned” portion of the “commissions.” In compliance with the order of the Insurance Commissioner, plain *651 tiff established the required reserve and filed amendments to its annual statement previously on file.
9. The Insurance Department of the Commonwealth of Pennsylvania requires North America to currently charge to expense all of the “commission” payments to plaintiff.
10. In the years 1950 to 1953, the reserves at the end of the respective years exceeded the reserves at the beginning of these years. In the plaintiff’s amended statements for these years, this excess, in accordance with the ruling of the Insurance Department, is taken directly into the reserve for unearned premiums as line 10, page 3 (Liability of Surplus and other Funds) and on Part 2B, line 20 (2), (4) and (7), at page 7, of the Insurance Department annual statements.
In the year 1954, the reserve at the end of the year was lower than at the beginning of the year. In the plaintiff’s amended statement for this year, the decrease, in accordance with the ruling of the Insurance Department, was taken directly into the earned premiums account on the annual statement for that year at page 4, State of Income, line 1 and at page 6, Part 2, Premiums Written and Premiums Earned, line 20 (7).
11. The annual statements for the years 1950 to 1954, as amended, conform to the requirements of the Insurance Department of the Commonwealth of Pennsylvania.
12. Plaintiff filed its federal tax returns for the years ended November 30, 1953 and November 30, 1954 on the basis that beginning with the taxable year ended November 30, 1950, its entire share of the premiums, including the “commissions,” should be taken into income only as “earned.”
13. Due to plaintiff’s inclusion of the “unearned commission” in its income subject to federal income and excess profits tax for the fiscal periods ending November 30,1950, and November 30, 1951 and November 30, 1952, inclusive, plaintiff contends its income and excess profits taxes for each of those taxable years were overpaid. Accordingly, plaintiff duly filed claims on Form 843 with the District Director of Internal Eevenue at Philadelphia, Pennsylvania, for the refund of the amounts hereinafter set forth, plus interest, or for such other amount as might be legally refundable:
*652 Year Ending Amount
November 30,1950_$114,980.24
November 30, 1951_ 56,437.98
November 30, 1952_ 200, 855. 82
14. Under date of June 25, 1956, the Commissioner of Internal Revenue issued a Notice of Deficiency to the plaintiff, determining a deficiency in income and excess profits taxes for the taxable year ended November 30, 1953 in the amount of $253,650.53. The proposed deficiency was based on the ground that the “commissions” should be taken into income in full in the year in which the premium is received from the policyholder. The deficiency was thereafter assessed; and the unpaid balance of the asserted liability was paid, which plaintiff claims results in an overpayment in the amount of $253,710.28 and of interest in the amount of $12,879.51.
15. As an alternative to the plaintiff’s position set forth in finding 12, if it should be held that the total reserves required by the Insurance Department of the Commonwealth of Pennsylvania with respect to the reinsurance “commissions” were properly eliminated from taxable income for the first time in the fiscal year ended November 30,1954, then plaintiff claims: (a) its income and excess profits taxes for this taxable year were overpaid to the extent hereinafter described, and (b) it is entitled to net operating loss carry-backs to each of the taxable years ending November 30,1953 and November 30,1952, with the consequence that its income and excess profits taxes for the year ended November 30, 1953, and its income taxes for the year ended November 30, 1952, were overpaid to the extent hereinafter described.
Based on these grounds, plaintiff duly filed a claim on Form 843 with the District Director of Internal Revenue of Philadelphia, Pennsylvania, for the refund of income and excess profits taxes for the taxable year ended November 30, 1954 in the amount of $399,104.55, plus interest, or such other amount as is legally refundable. This claim also includes a further alternative claiming an overpayment in the amount of $8,357.26, which has been allowed and refunded in the amount of $8,237.37.
*653 16. Based on. the grounds referred to in finding 12 and on the alternative grounds set forth in the preceding finding, plaintiff also duly filed a claim on Form 843 with the District Director of Internal Revenue at Philadelphia, Pennsylvania for the refund of federal income and excess profits taxes for the taxable year ended November 30, 1953 in the alternative amounts of $253,710.28 and $14,413.27, plus interest, or such other amount as might he legally refundable.
17. Based on the alternative ground set forth in the second paragraph of finding 15, plaintiff also duly filed a supplemental claim on Form 843 with the District Director of Internal Revenue at Philadelphia, Pennsylvania for the year ended November 30, 1952, for the refund of income taxes in the alternative amount of $47,468.21, plus interest, or such other amount as might legally be refundable.
18. By letter dated November 9,1956, the District Director of Internal Revenue disallowed plaintiff’s claim for refund for the year ended November 30,1950.
19. By letter dated November 9,1956, the District Director of Internal Revenue disallowed plaintiff’s claim for refund for the year ended November 30,1951.
20. By letters dated November 9, 1956 and July 15, 1957, respectively, the District Director of Internal Revenue disallowed plaintiff’s claim for refund and its supplemental claim for the year ended November 30,1952.
21. By letter dated July 15, 1957, the District Director of Internal Revenue disallowed plaintiff’s claim for refund for the year ended November 30,1953.
22. By letter dated July 15,1957, the District Director of Internal Revenue disallowed plaintiff’s claim for refund for the year ended November 30,1954.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and its petition is dismissed.